# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
### WESTERN DIVISION AT DAYTON

DONALD J. OLIVER,                                   :

     Plaintiff,                                 :
                                        Case No. 3:12cv00398

 vs.                                               :
                                        District Judge Thomas M. Rose

CAROLYN W. COLVIN,                                  :   Chief Magistrate Judge Sharon L. Ovington
Acting Commissioner of the Social
Security Administration,                            :

     Defendant.                                 :

---

# REPORT AND RECOMMENDATIONS[1]

---

## I.    Introduction

Plaintiff Donald J. Oliver brings this case challenging the Social Security Administration's denial of his applications for Supplemental Security Income (SSI) and Disability Insurance Benefits (DIB).  Plaintiff protectively filed his SSI and DIB applications on March 17, 2009, asserting that he has been under a "disability" since August 1, 2006.  (*PageID##* 211-17, 218-21).  Plaintiff claims to be disabled due to a back injury, depression, post traumatic stress disorder (PTSD), knee problems, high blood pressure, arthritis, spasms, and high cholesterol.  (*See PageID#* 252).

---

[1] Attached hereto is NOTICE to the parties regarding objections to this Report and Recommendations.

After various administrative proceedings, Administrative Law Judge (ALJ) Thomas R. McNichols, II denied Plaintiff's applications based on his conclusion that Plaintiff's impairments did not constitute a "disability" within the meaning of the Social Security Act. (*PageID##* 78-95). The ALJ's nondisability determination and the resulting denial of benefits later became the final decision of the Social Security Administration. This Court has jurisdiction to review the administrative denial of his applications. *See* 42 U.S.C. §§ 405(g), 1383(c)(3).

The case is before the Court upon Plaintiff's Statement of Errors (Doc. #7), the Commissioner's Memorandum in Opposition (Doc. #10), Plaintiff's Reply (Doc. # 11), the administrative record (Doc. #6), and the record as a whole.

## II. <u>Background</u>

### A. <u>Plaintiff's Vocational Profile and Testimony</u>

Plaintiff was 45 years old on his alleged disability onset date, which defined him as a "younger individual" for purposes of resolving his DIB and SSI claims. *See* 20 C.F.R. §§ 404.1563(c); 416.963(c)[2]; (*PageID##* 93, 247). Plaintiff has a high school education, with two years of college. *See* 20 C.F.R. § 404.1564(b)(3); (*PageID#* 258). He has past relevant employment as a building maintenance repairer, ironworker, and roofer. (*PageID##* 93, 253).

_____

[2] The remaining citations will identify the pertinent DIB Regulations with full knowledge of the corresponding SSI/DIB Regulations.

Plaintiff testified that he is 5' 11" tall and weighs about 240 pounds.  (*PageID#* 104).  He is not married, but has two dependent children (a seven-month old son and a two-year old daughter).  (*PageID#* 104-05).  He lives with his fiancée, his two children, his sister, and his two nephews.  (*PageID#* 105).  He has a driver's license but drives only once a month because he does not physically feel comfortable driving.  (*PageID#* 105-06).

Plaintiff testified that he last worked full-time as an ironworker.  (*PageID#* 107). He stopped working when he was injured on the job in a building collapse.[3]  (*Id.*).  He testified he was ultimately fired for performing CPR without a license on a coworker involved in the accident.  According to Plaintiff, when he was fired, he could not physically perform the job.  (*PageID##* 107-08, 127).  He testified he was fired because the company told him that he went against policy and could have killed the person he helped revive.  (*PageID#* 108).

Plaintiff testified to pain in his lumbosacral region.  (*PageID#* 109).  He has a ruptured vertebra in his back, as well as sciatica pain.  (*Id.*).  He has not had back surgery because he cannot afford it.  (*Id.*).  He testified he had physical therapy on his back and

---

[3] The accident is described with greater detail in the record as follows: "while working on a high-rise building, [Plaintiff] noted that concrete pieces were falling from above.  He was on the fourth floor and concrete was falling and small pieces of concrete were striking him and a co-worker.  It appeared to him that the concrete pieces became progressively larger and larger and he saw a large object falling towards him and his associate, so that in order to avoid being struck by this large piece, he pushed his colleague and the two of them literally dove through a glass door opening with his falling on his left knee. He sensed that other people were hanging from scaffolding and he ran down several flights (four stories) as quickly as possible, carrying large amounts of equipment, weight 80-100 pounds.  Rescue workers appeared and he and the rescue workers then climbed back up 23 flights with his still carrying 80-100 pounds of equipment plus also carrying the paramedic bag and rescue equipment in an attempt to rescue several fallen workers.  He found the bodies of two severely injured workers, both of who had died.  He began to experience low back pain after he again descended to the ground [from] the 23 stories." (*PageID#* 546).

left leg, but nothing helped relieve his pain.  (*Id.*).  At the time of the hearing, he was receiving epidural shots when he can afford them, which is usually one to three times a year.  (*PageID##* 109-10).

Plaintiff next testified to problems with his left shoulder, noting that he has had pain in his left shoulder radiating into his neck since he was six years old, and it feels like a pinched nerve.  (*PageID##* 110, 118).  He testified the doctor told him it might be a problem with his neck.  (*Id.*).  At the time of the hearing, he was on a waiting list for the University of Cincinnati's pain management program.  (*Id.*).  He was not receiving treatment because, as he explained, "I financially can't."  (*Id.*).  He cannot lift his left arm above his shoulder. (*PageID##* 110-11).  He has trouble lifting – and experiences some weakness – in his left arm.  (*PageID#* 111).  Plaintiff rated his left shoulder pain at a level 10 on a 0-10 visual analog scale.  (*PageID#* 118).  Medication does not help.  (*Id.*).

He testified that he has numbness in both legs and his knees "give out."  (*PageID#* 111).  Plaintiff testified that he had an arthroscopic surgery on his right knee in 2000 and on his left knee in 2006.  (*Id.*).  He testified the doctor told him he will need knee replacements because all the cartilage is gone.  (*PageID#* 112).  He testified he has been using a cane since the 2006 surgery, even at home.  (*PageID##* 112-13).  Plaintiff rated his back pain at a level between  8 ½ and 10 on a 0-10 visual analog scale.  (*PageID#* 117).  His pain is constant and radiates into his left hip and leg.  (*Id.*).  He testified he awakens every morning with numbness in both legs, and it recurs at night.  (*Id.*).  Plaintiff testified that his medication causes irritable bowel problems and restlessness.  (*Id.*).  He is most

4

comfortable laying on his back or side.  (*PageID#* 118).  The pain interrupts his sleep, and he testified it is getting worse.  (*PageID##* 118-19).

Plaintiff testified that he is independent in hygiene and grooming, but occasionally needs assistance with putting on his jacket.  (*PageID##* 120, 123).  He does not perform any household chores (all chores are performed by his sister and nephews).  (*PageID#* 121).  Plaintiff reported that he goes to the grocery once a month and to church occasionally.  (*PageID#* 122).  He does not go to the movies and has taken no trips in the last one or two years.  (*PageID##* 122-23).  He testified he tries to walk for exercise.  (*PageID#* 123).  Plaintiff testified that he smokes a half pack of cigarettes daily.  (*Id.*).  He testified that he spends his days lying down.  (*PageID#* 124).  He reads the newspaper and listens to music sometimes, but does not use a computer.  (*Id.*).  He testified his weight gain is due to steroids, because he eats only once a day.  (*Id.*).  His fiancée works, but his sister is home all day.  (*PageID#* 125).

Plaintiff acknowledged that he has depression, has frequent crying spells, does not want to be around others, stays in the house, and is forgetful.  (*PageID#* 113).  He testified he is no longer taking any antidepressant because it gave him "weird thoughts."  (*Id.*).  He testified he saw a psychiatrist in Florida for his PTSD, but he was not hospitalized.  (*PageID#* 116).  He testified a caseworker has been visiting the house for the last three years, and he has been seeing a counselor and psychiatrist once a month for the last year.  (*PageID##* 113-14).  He testified he has never been hospitalized for psychological

treatment. (*PageID#* 114). He testified that his PTSD results in daily flashbacks and sleep disruption. (*PageID##* 127-28).

Plaintiff estimated that he can walk less than 50 feet without his cane, can walk 75 feet with his cane, has pain, and his legs give out. (*PageID#* 119). He can stand 20 minutes and sit 45 minutes at a time. (*Id.*). He can climbs steps by using his cane and holding onto the railing. (*PageID#* 120). He is unable to raise his left arm above shoulder level and cannot lift anything with his left arm. (*Id.*). He is able to lift his right arm above shoulder level. (*Id.*). He can lift a gallon of milk. (*Id.*) He testified he cannot perform his past work, and he does not know if he would be able to do office work. (*PageID##* 120-21).

## B. **Vocational Expert Testimony**

A Vocational Expert (VE) also testified at the administrative hearing. (*PageID##* 129-36). The VE was asked a series of hypothetical questions based on an individual of Plaintiff's age, educational background, and work experience. The VE was asked to consider such a hypothetical person, who is also limited to light work with the opportunity to alternate between sitting and standing as needed; no climbing ladders, ropes, or scaffolds; no balancing; only occasional stooping and crouching; frequent twisting at the waist; no work above shoulder level; no work around hazards such as dangerous machinery or unprotected heights; low stress jobs, defined as no production quotas and no over-the shoulder supervision; simple, one- or two-step tasks requiring little, if any, concentration; no complex or detailed instructions; and limited contact with coworkers and

6

supervisors and no teamwork.  (*PageID##* 132-35).  The VE testified that a person with those limitations would be unable to perform his past relevant work, but could nevertheless still perform 16,000 regional jobs at the light level of exertion (such as a mail clerk and a stock clerk such as a marking clerk) and 5,500 regional jobs at the sedentary level of exertion (such as an addresser and inspector such as a type copy examiner).  (*Id.*).

When cross-examined by Plaintiff's counsel, the VE testified that if a person is off-task a third of the workday – every workday – they would not be able to perform full-time work at any exertional level.  (*PageID#* 136).  The VE also acknowledged that if an individual was consistently absent three times or more per month, it would preclude full-time work.  (*Id.*).

## C.   Relevant Medical Opinions

### 1.   Alan R. Boerger, Ph.D.

On June 29, 2009, Dr. Boerger consultatively examined Plaintiff at the request of the Ohio Bureau of Disability Determination (BDD).  (*PageID##* 443-48).  Plaintiff reported that he was depressed; had crying spells; experienced appetite and sleep disturbances; was self-isolating; experienced panic attacks; did not trust others; and had trouble paying attention.  He denied anhedonia, hopelessness, suicidal thoughts, and anger.  (*PageID##* 445-46).  Dr. Boerger diagnosed Plaintiff with PTSD and depressive disorder.  At that time, he assigned Plaintiff an overall Global Assessment of Functioning (GAF)

score of 51.[4]  (*PageID*# 447).  Dr. Boerger concluded that Plaintiff was mildly impaired in his ability to relate to others and to maintain attention, and was moderately impaired in his ability to tolerate stress.  (*PageID*## 447-48).

Dr. Boerger examined Plaintiff again on December 21, 2009.  (*PageID*## 469-74).  During the mental status examination, Dr. Boerger noted that Plaintiff was appropriately dressed; cooperative; and his speech and thought processes were appropriate, relevant and coherent.  At the time of the evaluation, he reported vivid thoughts about hurting people.  He also reported feeling anxious.  Plaintiff described his daily activities as taking care of his child, nephews, and the home.  He took care of his own hygiene, grooming, and household tasks.  (*PageID*## 472-73).

Dr. Boerger diagnosed Plaintiff with major depressive disorder single episode, severe without psychotic features, and PTSD.  He noted that Plaintiff appeared to be preoccupied with his injury and pain.  (*PageID*# 473).  Dr. Boerger assigned Plaintiff a functioning GAF score of 58 because he was able to maintain household responsibilities for children and his disabled sister.  He assigned an overall GAF score of 49.[5]  (*Id.*).

---

[4] Global Assessment Functioning is a tool used by health-care professionals to assess a person's psychological, social, and occupational functioning on a hypothetical continuum of mental illness.  It is, in general, a snapshot of a person's "overall psychological functioning" at or near the time of the evaluation.  *See Martin v. Comm'r of Soc. Sec.*, 61 Fed. Appx. 191, 194 n.2 (6th Cir. 2003); *see also* Diagnostic and Statistical Manual of Mental Disorders, 4th ed., Text Revision ("DSM-IV-TR") at 32-34.  Individuals with scores of 51-60 are classified as having "moderate symptoms ... or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)."  (*Id.*).

[5] A GAF of 45-50 indicates "severe symptoms ... or  serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)...." DSM-IV-TR at 34.

Dr. Boerger opined that Plaintiff was markedly impaired in his ability to relate to others, including co-workers and supervisors, as a result of anger problems as reflected in a pattern of social withdrawal and some conflicts in public situations.  Dr. Boerger also opined Plaintiff was markedly impaired in his ability to withstand stress and pressures associated with day-to-day work activity as a result of the depression, anxiety, anger problems, and low frustration tolerance.  He found Plaintiff was moderately impaired in his ability understand, remember, and follow instructions, and mildly impairment in his ability to maintain attention to perform simple repetitive tasks.  (*PageID##* 447-48).

### 2. Joan Williams, Ph.D./Robelyn Marlow, Ph.D.

Dr. Williams reviewed the file on behalf of the Ohio BDD on July 30, 2009. (*PageID##* 449-66).  Dr. Williams opined that Plaintiff was mildly restricted in his daily activities, had mild difficulties in his social functioning, and had moderate difficulties in his concentration, persistence, or pace.  (*PageID#* 463).  Dr. Williams found that Plaintiff could complete simple instructions in a work setting with a consistent routine and no contact with the general public.  (*PageID#* 451).

Another state agency psychologist, Dr. Marlow, affirmed Dr. Williams' assessment on January 4, 2010.  (*PageID#* 484).  Dr. Marlow considered the opinions of Dr. Boerger and found that Plaintiff had no more than moderate restrictions in dealing with others and dealing with stress, given that Plaintiff told Dr. Boerger during the examination that he got along well with people on the job and Dr. Boerger found he was only mildly impaired in this area six months earlier.  (*Id.*).  Dr. Marlow also found that Dr. Boerger changed his

9

opinion based on a change in Plaintiff's own report that he had vivid thoughts about hurting people, even though there was no other medical evidence to support Plaintiff's self report.  (*Id.*).  Dr. Marlow opined that Plaintiff had no more than a moderate limitation in his ability to deal with others and could withstand the stress of a low impact work environment without strict time or productivity requirements.  (*Id.*).

     **3.**     **Damian Danopulos, M.D.**

On June 12, 2009, Dr. Danopulos consultatively examined Plaintiff at the request of the Ohio BDD.  (*PageID*## 432-41).  Plaintiff complained of low back pain which radiates to both legs, right shoulder pain radiating down to his right hand and upper chest, hypertension, and depression with PTSD.  (*PageID#* 432).  On examination, Plaintiff dressed and undressed normally, and Dr. Danopulos reported that his remaining movements were normal.  (*PageID#* 434).  Dr. Danopulos found a full range of motion of the upper and lower extremities, including painless range of motion of the right shoulder and painless and normal range of motion of the knees.  He noted no evidence of joint abnormalities or tropic changes in the lower extremities.  Dr. Danopulos also stated that a musculoskeletal examination showed a normal gait without ambulatory aids.  Plaintiff's spine was painful to pressure at the lumbo/sacral spine; he experienced restricted and painful range of motion of the lumbar spine; had a normal toes and heel gait; and his straight leg raising was positive at 80 degree level.  (*PageID#* 435).  According to Dr. Danopulos, Plaintiff was able to squat and arise from squatting normally, and there was no evidence of nerve root compression or peripheral neuropathy.  He also noted a normal

neurological examination. (*Id.*). Dr. Danopulos listed his objective findings as mild to moderate lumbar spine arthritic changes; right shoulder arthralgias; left knee arthralgias; well controlled blood pressure; and mental disturbance, including depression and PTSD. (*PageID#* 436). Dr. Danopulos concluded that Plaintiff's ability to work was affected by his lumbosacral spine and mild to moderate arthritic changes. (*PageID#* 437).

### 4. __Aivars Vitols, D.O.__

Consultative orthopedic surgeon, Dr. Vitols, examined Plaintiff on behalf of the Ohio BDD on December 31, 2009. (*PageID##* 476-83). On examination, Dr. Vitols found painful and restricted range of motion with relative loss of strength due to pain. (*PageID#* 478). Dr. Vitols diagnosed Plaintiff with degenerative disc disease with associated spondylosis, herniated L5-S1 disc, and left sciatica. (*PageID#* 479). Dr. Vitols concluded that Plaintiff is capable of sedentary to light exertional work, but his ability to twist and bend is somewhat limited; he cannot stand or walk for long periods; and he cannot reach with his right arm above shoulder height. (*Id.*).

### 5. __Maria Congbalay, M.D.__

Dr. Congbalay reviewed the file on February 10, 2010. (*PageID##* 485-92). Dr. Congbalay concluded that Plaintiff could lift, carry, push and pull 20 pounds occasionally and 10 pounds frequently; stand and/or walk for about six hours in an eight-hour workday; and sit for about six hours in an eight-hour workday. (*PageID#* 486). Plaintiff was also to avoid climbing ladders, ropes, or scaffolds; could only occasionally stoop and crouch; and only occasionally reach overhead with his right arm. (*PageID##* 487-88). Dr. Congbalay

11

also noted that Plaintiff's allegations are partially credible.  For example, Plaintiff reported using a cane and wearing knee braces on both knees, yet presented without a cane or knee braces for any of his examinations.  She gave the consultive opinions weight.  (*PageID#* 490).

## III.   Administrative Review

### A.   "Disability" Defined

To be eligible for SSI or DIB a claimant must be under a "disability" within the definition of the Social Security Act.  *See* 42 U.S.C. §§ 423(a), (d), 1382c(a).  The definition of the term "disability" is essentially the same for both DIB and SSI.  *See Bowen v. City of New York*, 476 U.S. 467, 469-70 (1986).  Narrowed to its statutory meaning, a "disability" includes only physical or mental impairments that are both "medically determinable" and severe enough to prevent the applicant from (1) performing his or her past job and (2) engaging in "substantial gainful activity" that is available in the regional or national economies.  *See Bowen*, 476 U.S. at 469-70 (1986).

A DIB/SSI applicant bears the ultimate burden of establishing that he or she is under a disability.  *See Key v. Callahan*, 109 F.3d 270, 274 (6th Cir. 1997); *see Wyatt v. Sec'y of Health & Human Servs.*, 974 F.2d 680, 683 (6th Cir. 1992); *see also Hephner v. Mathews*, 574 F.2d 359, 361 (6th Cir. 1978).

### B.   ALJ McNichols' Decision

ALJ McNichols resolved Plaintiff's disability claim by using the five-Step

sequential evaluation procedure required by Social Security Regulations.  *See PageID##* 79-80; *see also* 20 C.F.R. § 404.1520(a)(4).  His pertinent findings began at Step 2 of the sequential evaluation where he concluded that Plaintiff had the following severe impairments: chronic low back pain, history of right shoulder arthralgias, bilateral knee pain, obesity, depression, and PTSD.  (*PageID#* 82).

The ALJ concluded at Step 3 that Plaintiff did not have an impairment or combination of impairments that met or equaled the criteria in the Commissioner's Listing of Impairments.  (*PageID#* 85).

At Step 4, the ALJ concluded that Plaintiff retained the residual functional capacity (RFC) to perform light work with the following additional limitations: the opportunity to alternate between sitting and standing as needed; no climbing ladders, ropes, or scaffolds; no balancing; occasional stooping and crouching; frequent twisting at the waist; no work above shoulder level; no work around hazards such as dangerous machinery or unprotected heights.  (*PageID#* 87).  Due to his mental impairments, Plaintiff is restricted to low stress work, which is defined as no production quotas and no over-the-shoulder supervision; simple, one- or two-step tasks requiring little, if any, concentration; no complex or detailed instructions; and limited contact with coworkers and supervisors and no teamwork.  (*Id.*).  The ALJ further found that Plaintiff is not capable of performing his past relevant work.  (*PageID#* 93).

13

At Step 5, the ALJ concluded that – considering Plaintiff's age, education, work experience, and RFC – there are jobs that exist in significant numbers in the national economy that Plaintiff can perform.  (*PageID#* 93).

The ALJ's findings throughout his sequential evaluation led him to ultimately conclude that Plaintiff was not under a disability, and was therefore not eligible for DIB or SSI.  (*PageID##* 94-95).

## IV.  <u>Judicial Review</u>

Judicial review of an ALJ's decision proceeds along two lines: "whether the ALJ applied the correct legal standards and whether the findings of the ALJ are supported by substantial evidence." *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009); *see Bowen v. Comm'r of Soc. Sec.*, 478 F3d 742, 745-46 (6th Cir. 2007).

Review for substantial evidence is not driven by whether the Court agrees or disagrees with the ALJ's factual findings or by whether the administrative record contains evidence contrary to those factual findings.  *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007); *see Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999).  Instead, the ALJ's factual findings are upheld if the substantial-evidence standard is met – that is, "if a 'reasonable mind might accept the relevant evidence as adequate to support a conclusion.'" *Blakley*, 581 F.3d at 407 (quoting *Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 390 (6th Cir. 2004)).  Substantial evidence consists of "more than a scintilla of evidence but less than a preponderance..." *Rogers*, 486 F.3d at 241.

The second line of judicial inquiry – reviewing for correctness the ALJ's legal criteria – may result in reversal even if the record contains substantial evidence supporting the ALJ's factual findings.  *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 651 (6th Cir. 2009); *see Bowen*, 478 F3d at 746.  "[E]ven if supported by substantial evidence, 'a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.'"  *Rabbers*, 582 F.3d at 651 (quoting in part *Bowen*, 478 F.3d at 746, and citing *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 546-47 (6th Cir. 2004)).

## V.  <u>Discussion</u>

### A.  <u>Plaintiff's Contentions</u>

Plaintiff contends the ALJ erred at Step 3 by failing to find that his mental impairments meet Listing 12.06 (anxiety-related disorders), and his physical impairments meet Listing 1.04 (disorders of the spine).  Plaintiff also contends the ALJ failed to appropriately evaluate Plaintiff's pain and credibility.

### B.  <u>Analysis</u>

#### 1.  **Listing 12.06**

The Sixth Circuit has long held "the burden of proof lies with the claimant at steps one through four of the [sequential disability benefits analysis]," including proving presumptive disability by meeting or exceeding a Medical Listing at step three.  *Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 391 (6th Cir. 1999).  Thus, if Plaintiff "can show an

impairment is listed in [20 C.F.R. part 404, subpart P] Appendix 1 ('the [Listings'), or is equal to a listed impairment, the ALJ must find the claimant disabled." *Burgess v. Sec'y of Health & Human Servs.*, 835 F.2d 139, 140 (6th Cir. 1987). In order for Plaintiff "to qualify as disabled under a listed impairment, [she] must meet all the requirements specified in the Listing." (*Id.*). As the Commissioner notes, this must be done by presenting specific medical findings that satisfy the particular Listing. *See Sullivan v. Zebley*, 493 U.S. 521, 530–32 (1990). An impairment that manifests only some of the criteria in a particular Listing, "no matter how severely, does not qualify." (*Id.* at 530).

Plaintiff argues that the ALJ erred in failing to find his mental impairment met or equaled Listing 12.06. However, for the reasons stated below, the Court finds the ALJ's analysis to be supported by substantial evidence.

In evaluating psychiatric impairments, the Commissioner's regulations provide that the ALJ should consider such factors as the claimant's ability to: understand, carry out, and remember simple instructions; respond appropriately to supervision, co-workers and usual work situations; and deal with changes in a routine work setting. 20 C.F.R. § 404.1521(b). Disability is to be sequentially evaluated. The signs and symptoms which would support a determination[6] that a claimant suffers from a totally disabling psychiatric impairment are set out in §§ 12.01 through 12.09, Subpart P, Appendix 1, Listing of Impairments. The presence or absence of these and similar signs and symptoms is

---

[6] Such a determination would be made on the basis of the psychiatric evidence alone, without reference to the claimant's age, education, and work experience

controlling, while an individual physician's opinion on the ultimate issue of disability is not.  20 C.F.R. §§ 404.1513(b), (c), (d), 404.1526(b), and 404.1527.

The Commissioner has adopted a special procedure for evaluating mental impairments.  20 C.F.R. § 404.1520a.  The ALJ must fill out a detailed Psychiatric Review Technique Form to assist him or her in evaluating each factor of the appropriate psychiatric Listing(s), 20 C.F.R. § 404.1520a(d), and must attempt to "rate the degree of functional loss resulting from the impairment(s)." 20 C.F.R. § 404.1520a(b)(3).  Then, the ALJ must determine whether the impairment is severe, 20 C.F.R. § 404.1520a(c)(1), and, if so, must determine whether the impairment meets or equals a Listing.  20 C.F.R. § 404.1520a(c)(2).

If the ALJ determines that the claimant does not meet or equal one of the psychiatric Listings, he must determine whether the psychiatric impairment – considering the claimant's age, education, and prior work experience – nonetheless renders plaintiff disabled.  20 C.F.R. § 404.1520a(c)(3).  In making this decision, the ALJ must consider the same types of evidence used to determine whether the claimant's impairment meets or equals the Listings.  *See* Social Security Ruling 85-16, 1985 SSR LEXIS 18.

Listing 12.06 relating to anxiety-related disorders, requires that an individual satisfy either the criteria in subparts A and B, or subparts A and C of the Listing.  20 C.F.R. Part 404, Subpart P, Appendix 1, § 12.06.  There is no dispute that Plaintiff satisfied the "A" criteria for Listing 12.06.  Subpart B requires at least two of the following: 1) marked restriction of activities of daily living; 2) marked difficulties in maintaining social

functioning; 3) marked difficulties in maintaining concentration, persistence, or pace; or 4) repeated episodes of decompensation, each of extended duration. Subpart C can be satisfied by establishing a complete inability to function independently outside the area of one's home. (*Id.*).

The objective evidence of record supports the ALJ's finding that Plaintiff's depression and PTSD are severe impairments. Substantial evidence also supports the ALJ's finding that Plaintiff did not meet or equal the "B" criteria of Listing 12.06. (*PageID##* 85-86).

The Court agrees with the ALJ's finding that the record demonstrates Plaintiff experiences few restrictions in his activities of daily living. Plaintiff reports that he goes to the grocery once a month, walks for exercise, smokes a half pack of cigarettes daily, reads the newspaper, and listens to music. (*PageID##* 122-24). He reported that he is able to feed, dress, and groom himself. (*PageID#* 123). He cares for his children and makes sure his nephews are off to school. (*PageID##* 472-73). In December 2009, he reported to consultive examiner, Dr. Vitols, that he is independent in ADLs; occasionally uses a cane (but did not have a cane during the examination); reported he is able to perform some household chores; and stated that he can walk to the grocery store, which is only a block or two away from his house. (*PageID#* 476). Accordingly, the ALJ's finding – that Plaintiff's activities of daily living are only mildly impaired – is supported by substantial evidence. (*PageID#* 85).

Substantial evidence also supports the ALJ's finding that Plaintiff's social functioning is only mildly impaired and Plaintiff's ability to maintain concentration, persistence, or pace is moderately impaired – not markedly impaired.  (*PageID## 85-86*). Plaintiff argues that the ALJ erred by rejecting Dr. Boerger's determination that his ability to relate to others, including fellow workers and supervisors, is markedly impaired as a result of anger problems and as reflected in a pattern of social withdrawal and some conflicts in public situations; and that his ability to withstand stress and pressures associated with day-to-day work activity is markedly impaired as a result of the depression, anxiety, anger problems, and low frustration tolerance.  (*PageID## 473-74*). In support of this argument, Plaintiff points to Dr. Boerger's assignment of a GAF symptom score of 49.  Dr. Boerger estimated a marked degree of impairment in two functional areas, but assigned Plaintiff a GAF functional severity score of 58.  (*PageID## 473-74*).  "Discretion is vested in the ALJ to weigh all the evidence." *Collins v. Comm'r of Soc. Sec.*, 357 F.App'x 663, 668 (6th Cir. 2009).  Social Security matters often involve conflicting medical evidence, and the ALJ is vested with the duty to resolve questions of fact.  *Mullins v. Sec'y of Health & Human Servs.*, 836 F.2d 980 (6th Cir. 1987).

Dr. Boerger conducted a consultative examination at the request of the state agency. He is not a treating physician.  Accordingly, Dr. Boerger's opinion is not entitled to controlling weight.  *Cf. Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 540 (6th Cir. 2007). Contrary to Plaintiff's argument, the ALJ did not simply reject Dr. Boerger's opinion or give the inappropriate evidentiary weight to the opinion.  (*PageID# 86*).  Rather, the ALJ

considered Dr. Boerger's opinion along with the other mental health evidence of record, but concluded that Plaintiff should be limited to low stress jobs, with no production quotas and no over-the-shoulder supervision; simple, one- or two-step tasks requiring little, if any, concentration; no complex or detailed instructions; and limited contact with coworkers and supervisors and no teamwork. (*PageID#* 87). The ALJ's conclusion is supported by the opinions of Drs. Williams and Marlow, who found Plaintiff to be mildly or moderately limited, at most. (*PageID##* 449-66, 484). The amount of weight the ALJ ultimately accorded Dr. Boerger's opinion is well within the permissible "zone of choice" that the Sixth Circuit discussed in *Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1994) ("The substantial evidence standard presupposes that there is a 'zone of choice' within which the Secretary may proceed without interference from the courts.")(internal citations omitted).

In addition, Plaintiff has been found to be able to maintain satisfactory attention and concentration during interviews, and able to understand and follow directions. (*PageID##* 432-41, 443-48, 449-66, 476-83, 484). The ALJ's finding – that Plaintiff has only moderate difficulties in maintaining concentration, persistence, or pace – is supported by substantial evidence of record, as is his finding that Plaintiff's social functioning is only mildly impaired. Furthermore, the ALJ reasonably determined that there is no evidence in the record that Plaintiff experienced episodes of decompensation, and Plaintiff points to no evidence in the record to support a claim that he has experienced any episodes of decompensation. (*PageID##* 85-86).

Therefore, because Plaintiff's mental impairments do not include at least two "marked" limitations, or one "marked" limitation and "repeated" episodes of decompensation, each of extended duration, the "B" criteria is not satisfied for the Listing. (*PageID##* 85-86).  Accordingly, the ALJ's finding that Plaintiff has not met or equaled Listing 12.06 is supported by substantial evidence.

### 2.    Listing 1.04

Plaintiff also argues the ALJ committed reversible error in failing to find him disabled under Social Security Listing 1.04, which provides in pertinent part:

> 1.04 Disorders of the spine (e.g., herniated nucleus pulposus, spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc disease, facet arthritis, vertebral fracture), resulting in compromise of a nerve root (including the cauda equina) or the spinal cord. With:
>
> A. Evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine);
>
> B. Spinal arachnoiditis, confirmed by an operative note or pathology report of tissue biopsy, or by appropriate medically acceptable imaging, manifested by severe burning or painful dysesthesia, resulting in the need for changes in position or posture more than once every 2 hours;
>
> C. Lumbar spinal stenosis resulting in pseudoclaudication, established by findings on appropriate medically acceptable imaging, manifested by chronic nonradicular pain and weakness, and resulting in inability to ambulate effectively, as defined in 1.00B2b.

20 CFR Pt. 404, Subpt. P, App. 1.  An inability to ambulate effectively means an "extreme limitation of the ability to walk."  20 CFR pt. 404, subpt. P, app. 1, § 1.00B2b(1). Ineffective ambulation is generally defined "as having insufficient lower extremity

functioning . . . to permit independent ambulation without the use of a hand-held assistive device(s) that limits the function of both upper extremities." (*Id.*).  A person ambulates effectively if they are "capable of sustaining a reasonable walking pace over a sufficient distance to be able to carry out activities of daily living . . . [and can] travel without companion assistance to and from a place of employment."  20 C.F.R. pt. 404, subpt. P, app. 1, § 1.00B2b(2).

In this case, the ALJ began his Step 3 analysis with the following statement as to whether Plaintiff's physical impairments met or equaled the criteria set forth in Listing 1.04:

> The severity of the claimant's impairments does not meet or medically equal the level of severity of an impairment described in section 1.02 (other and unspecified arthropathies), 1.04 (disorders of the back (discogenic and degenerative)), 20.00 (obesity), or any other section of Appendix 1, Subpart P, Regulations No. 4.

(*PageID##* 85-86).[7]  The ALJ then proceeded to discuss, and thoroughly analyze, whether Plaintiff's mental impairments met or equaled the criteria set forth in section 12.06 of the Listings.  He concluded they did not, and proceeded to the next step in the 5-step analysis.

Although the ALJ may have carefully analyzed whether Plaintiff's mental impairments met or equaled the criteria in Listing 12.06, he simply dismissed the possibility that Plaintiff's physical impairments met or equaled the criteria set forth in Listing 1.04 with a single conclusory sentence.

---

[7] The Listing of Impairments is found in 20 C.F.R. pt. 404, Subpt. P, App. 1, and describes impairments for each of the major body systems that the Social Security Administration considers to be severe enough to prevent an individual from doing any gainful activity, regardless of his or her age, education, or work experience.  20 C.F.R. § 404.1525.

The Commissioner is required to provide more than a bare conclusion when making findings of fact and decisions as to the rights of individuals applying for disability. Specifically, the Social Security Act requires the following:

> The Commissioner of Social Security is directed to make findings of fact, and decisions as to the rights of any individual applying for a payment under this title [42 USCS §§ 401 et seq.].  Any such decision by the Commissioner of Social Security which involves a determination of disability and which is in whole or in part unfavorable to such individual shall contain a statement of the case, in understandable language, setting forth a discussion of the evidence, and stating the Commissioner's determination and the reason or reasons upon which it is based . . .

42 U.S.C. § 405(b)(1).

Without an appropriate analysis, the Court cannot effectively evaluate whether the ALJ's decision is supported by substantial evidence.  *Reynolds v. Comm'r of Soc. Sec.*, 424 Fed. Appx. 411, 416 (6th Cir. 2011) ("In short, the ALJ needed to actually evaluate the evidence, compare it to Section 1.00 of the Listing, and give an explained conclusion, in order to facilitate meaningful judicial review.  Without it, it is impossible to say that the ALJ's decision at Step Three was supported by substantial evidence.") (other citations omitted).

The Commissioner contends, however, that even if the ALJ erred in addressing the Listings, such an error was harmless because "Plaintiff has not put forth adequate evidence that showed he could meet the pertinent listing."  (Doc. #10, PageID# 700).  Although the Commissioner has aptly noted it is possible that application of harmless error may be appropriate where a review of the material considered by an ALJ elsewhere in his or her decision would make it abundantly clear that no reasonable factfinder, following the

correct procedure, could have resolved the factual matter in another manner, the Court concludes this case does not present such a scenario.  *See, e.g., Neal ex. rel. Walker v. Barnhart*, 405 F.3d 685, 689 (8th Cir. 2005) ("Harmless error analysis may be appropriate to supply a missing dispositive finding in a social security disability proceeding, where, based on material the ALJ considered, the court can confidently say that no reasonably administrative factfinder, following the correct analysis, could have resolved the factual matter in any other way.").

The ALJ's failure to provide the proper analysis at Step 3 does not amount to harmless error in this case.  Based on a careful review of the material the ALJ considered elsewhere in his decision, the Court is simply unable to determine that a reasonable factfinder, following the correct procedure, could not have resolved the Step 3 finding in another manner.  Moreover, even if the Court were to fully accept Defendant's argument that "Plaintiff has not put forth adequate evidence that showed he could meet the pertinent listing," a reasonable factfinder might very well have found that Plaintiff's impairments at least *equaled* it.  *See* 20 C.F.R. § 404.1526(a)("Your impairment(s) is medically equivalent to a listed impairment in  appendix 1 if it is at least equal in severity and duration to the criteria of any listed impairment).

For example, a MRI of Plaintiff's lumbar spine, dated August 2, 2007, showed degenerative disc disease at L4-5, L5-S1, and a posterior rupture lightly eccentric toward the left side at disc L5-S1.  (*PageID#* 429).  A MRI from September 12, 2007, "clearly shows a L5-S1 left sided disc herniation which is impinging on the S1 nerve root."  (*Id.*).

In August 2007, Dr. Zeal, a neurosurgeon, opined that "Mr. Oliver does have a lumbar disc herniation at L5-S1 on the left, and there appears to be nerve root impingement involving the left S1 nerve root." (*PageID#* 550). Dr. Zeal also requested a repeat MRI be performed with more advanced imaging capabilities. (*Id.*). In September 2007, after the additional MRIs were conducted,[8] Dr. Zeal opined that "[t]here is clearly a left-central herniation at L5-S1 with moderate thecal sac impingement and definite impingement and posterior/dorsal displacement of the left S1 nerve root. There might be some L5 root impingement as well." (*PageID#* 557). A more recent MRI of the lumbar spine, from July 2010, indicated "L4-5 disc bulging and central disc protrusion abutting the ventral aspect of the thecal sac with facet degeneration; L6-S1 disc bulging and central disc protrusion indenting the epidural fat with facet degeneration; T12-L1 disc bulging indenting the ventral aspect of the thecal sac." (*PageID#* 493).

A full review and analysis after remand may not, of course, result in a disability finding at Step 3. Yet careful consideration of the evidence in this case reveals the opposite scenario – a finding of disability at Step 3 – appears to certainly remain as a possible result. As such, application of the harmless error doctrine is not warranted in this case.

Accordingly, for all of the above reasons, Plaintiff's argument is well taken.[9]

## VI.  **Remand is Warranted**

---

[8] Dr. Zeal noted the quality of the newly obtained images "are all excellent." (*PageID#* 557).

[9] In light of the above review, and the resulting need for remand of this case, an in-depth analysis of Plaintiff's remaining assignments of error is unwarranted.

If the ALJ failed to apply the correct legal standards or his factual conclusions are not supported by substantial evidence, the Court must decide whether to remand the case for rehearing or to reverse and order an award of benefits. Under Sentence Four of 42 U.S.C. § 405(g), the Court has authority to affirm, modify, or reverse the Commissioner's decision "with or without remanding the cause for rehearing." *Melkonyan v. Sullivan*, 501 U.S. 89, 99 (1991). Remand is appropriate if the Commissioner applied an erroneous principle of law, failed to consider certain evidence, failed to consider the combined effect of impairments, or failed to make a credibility finding. *Faucher v. Sec'y of Health & Human Servs.,* 17 F.3d 171, 176 (6th Cir. 1994).

A judicial award of benefits is unwarranted in the present case, because the evidence of disability is not overwhelming, and because the evidence of a disability is not strong while contrary evidence is weak. *See id.* However, Plaintiff is entitled to an Order remanding this case to the Social Security Administration pursuant to Sentence Four of § 405(g) due to problems outlined above.

On remand, the ALJ should be directed to evaluate Plaintiff's disability claim under the required five-step sequential analysis to determine anew whether Plaintiff was under a disability and whether his applications for DIB and SSI should be granted.

## IT IS THEREFORE RECOMMENDED THAT:

1.  The ALJ's non-disability finding be vacated;

2.  No finding be made as to whether Plaintiff Donald J. Oliver was under a "disability" within the meaning of the Social Security Act;

3.  This matter be **REMANDED** to the Social Security Administration pursuant to Sentence Four of 42 U.S.C. § 405(g) for further proceedings consistent

26

with this Report and Recommendations, and any decision adopting this Report and Recommendations; and

4.      The case be **TERMINATED** on the docket of this Court.


November 26, 2013

                                        _____s/Sharon L. Ovington_____
                                              Sharon L. Ovington
                                Chief United States Magistrate Judge

## NOTICE REGARDING OBJECTIONS

Pursuant to Fed. R. Civ. P. 72(b), any party may serve and file specific, written objections to the proposed findings and recommendations within **FOURTEEN** days after being served with this Report and Recommendations. Pursuant to Fed. R. Civ. P. 6(d), this period is extended to **SEVENTEEN** days because this Report is being served by one of the methods of service listed in Fed. R. Civ. P. 5(b)(2)(C), (D), (E), or (F). Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum of law in support of the objections. If the Report and Recommendation is based in whole or in part upon matters occurring of record at an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or such portions of it as all parties may agree upon or the Magistrate Judge deems sufficient, unless the assigned District Judge otherwise directs. A party may respond to another party's objections within **FOURTEEN** days after being served with a copy thereof.

Failure to make objections in accordance with this procedure may forfeit rights on appeal. *See Thomas v. Arn,* 474 U.S. 140 (1985); *United States v. Walters,* 638 F.2d 947, 949-50 (6th Cir. 1981).